**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LISA MILKOVICH; DANG NGUYEN,
*Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA,
*Defendant-Appellee.*

No. 19-35582

D.C. No.
2:18-cv-01658-
BJR

OPINION

Appeal from the United States District Court
for the Western District of Washington
Barbara Jacobs Rothstein, District Judge, Presiding

Submitted September 1, 2020
Submission Vacated October 6, 2020
Argued and Submitted November 3, 2020
Seattle, Washington

Filed March 2, 2022

Before: Jay S. Bybee and Daniel P. Collins, Circuit Judges,
and Richard G. Stearns,* District Judge.

Opinion by Judge Collins;
Dissent by Judge Stearns

---

*The Honorable Richard G. Stearns, United States District Judge
for the District of Massachusetts, sitting by designation.

## SUMMARY[**]

### Tax

The panel reversed the district court's dismissal, under Federal Rule of Procedure 12(b)(6), of a complaint by taxpayers in a tax refund action in which they sought to deduct mortgage interest that their lender received at the short sale of taxpayer's home.

Taxpayers took out a mortgage in connection with purchasing a home, and eventually filed for bankruptcy. When the bankruptcy petition was discharged, their mortgage loan changed from "recourse" to "nonrecourse." This eliminated CitiMortgage's pre-existing ability to enforce the mortgage debt personally against taxpayers, and instead limited CitiMortgage to enforcing only the value of its lien. CitiMortgage received about $522,015 from the short sale of the house, credited $114,688 of it toward the accumulated unpaid interest on the secured loan, and credited the remaining amount toward paying off the loan principal. Taxpayers claimed a $114,688 mortgage interest deduction for that year. The Internal Revenue Service disallowed the deduction under I.R.C. § 265(a)(1).

The panel held that, on the facts as pleaded, taxpayers are entitled to deduct the mortgage interest. The panel held that the district court erred in extending the principles of *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976) to short sales involving mortgages that were valid *ab initio*. The panel further held that the fact that taxpayers'

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

mortgage had been converted, through the bankruptcy discharge, from recourse to nonrecourse provides no basis for declining the deduction and applying the settled rules for a short sale and extinguishment of nonrecourse debt under the approach set forth in *Commissioner v. Tufts*, 461 U.S. 300 (1983).

Judge Stearns dissented because he was persuaded that the majority opinion is based on a flawed factual premise and misreading of the applicable law. Judge Stearns disagrees that taxpayers "paid" the mortgage interest for which they sought a tax deduction. Judge Stearns also believes that the majority's legal reasoning is in error and contrary to Circuit precedent.

## COUNSEL

Kenneth C. Weil (argued), Law Office of Kenneth C. Weil, Seattle, Washington, for Plaintiffs-Appellants.

Rachel Ida Wollitzer (argued) and Joan I. Oppenheimer, Attorneys, Tax Division/Appellate Section; Richard E. Zuckerman, Principal Deputy Assistant Attorney General; United States Department of Justice, Washington, D.C.

**OPINION**

COLLINS, Circuit Judge:

Plaintiffs Lisa Milkovich and her husband Dang Nguyen appeal from the district court's dismissal of their complaint seeking a refund of additional taxes they paid after the Internal Revenue Service ("IRS") disallowed the deduction they had claimed for the mortgage interest that their lender received at the short sale of their home.  Concluding that, on the facts as pleaded, Plaintiffs were entitled to the deduction, we reverse.

**I**

**A**

In 2005, Plaintiffs purchased a home in Renton, Washington for $748,425, and they took out a mortgage in connection with that purchase.[1]  The complaint does not disclose the original value of that mortgage, but a year later Plaintiffs refinanced that loan.  The new mortgage had a principal amount of $744,993, and the mortgage was ultimately held by CitiMortgage.  Several years later, Plaintiffs became unable to continue making their monthly payments of $3,724.94, and they made their last such monthly payment in February 2009.

---

[1] Because this action was dismissed at the pleading stage, the well-pleaded factual allegations in Plaintiffs' complaint must be taken true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Review is generally limited to the face of the complaint, materials incorporated into the complaint by reference, and matters of judicial notice."  *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 938 (9th Cir. 2018) (simplified).

Plaintiffs jointly filed for Chapter 7 bankruptcy in January 2010. In the schedules filed with their bankruptcy petition, Plaintiffs reported that their home had an approximate current value of $600,000. Because the value of Plaintiffs' home was well below the amount of CitiMortgage's secured lien, the home had no value to creditors in the bankruptcy estate. Indeed, after examining Plaintiffs' financial affairs, the bankruptcy trustee promptly reported to the bankruptcy court that "there is no property available for distribution from the estate over and above that exempted by law" and that he was abandoning the assets of the estate with no distribution to creditors. As a result, Plaintiffs retained legal title to their home after the trustee's abandonment. *See Mason v. Commissioner*, 646 F.2d 1309, 1310 (9th Cir. 1980) (noting that, upon abandonment, "any title that was vested in the trustee is extinguished, and the title reverts to the bankrupt, nunc pro tunc").

In April 2010, Plaintiffs received a discharge from the bankruptcy court. The parties agree that this discharge changed Plaintiffs' mortgage from "recourse" to "nonrecourse"—that is, it eliminated the pre-existing ability of CitiMortgage to enforce the mortgage debt *personally* against Plaintiffs and instead limited CitiMortgage to enforcing only the value of its lien. *See Johnson v. Home State Bank*, 501 U.S. 78, 84 (1991) ("[A] bankruptcy discharge extinguishes only one mode of enforcing a claim—namely, an action against the debtor *in personam*—while leaving intact another—namely, an action against the debtor *in rem*."). Plaintiffs were thus relieved of personal liability on the mortgage debt, but the loan owed to CitiMortgage continued to be secured by the property and Plaintiffs' payment schedule (if they wished to avoid foreclosure) was unaffected by the discharge. *See Dewsnup v. Timm*, 502 U.S. 410, 417 (1992) (noting that a secured lien

survives bankruptcy and "stays with the real property until the foreclosure," even if the value appreciates); *see also Johnson*, 501 U.S. at 83 ("[A] creditor's right to foreclose on the mortgage survives or passes through the bankruptcy.").

Rather than foreclose on the property, CitiMortgage eventually agreed to a "short sale," which took place in July 2011. "A short sale is a real estate transaction in which the property serving as collateral for a mortgage is sold for less than the outstanding balance on the secured loan, and the mortgage lender agrees to discount the loan balance because of a consumer's economic distress." *Shaw v. Experian Info. Sols., Inc.*, 891 F.3d 749, 752 (9th Cir. 2018). The sale price of the residence at the short sale was approximately $555,005.92, of which about $522,015 was paid to CitiMortgage in satisfaction of the loan. CitiMortgage credited $114,688 toward the accumulated unpaid interest on the secured loan, while the remaining amount was credited toward paying off the loan principal. CitiMortgage then issued a Form 1098-Mortgage Interest Statement ("Form 1098-MIS") for 2011 indicating that it had received $114,688 in interest payments from Plaintiffs. Based on that statement, Plaintiffs claimed a $114,688 mortgage interest deduction that year.

**B**

In October 2014, the IRS issued a notice of deficiency, stating that the IRS intended to disallow the $114,688 interest deduction on the ground that Plaintiffs "did not establish that the amount . . . was (a) interest expense, and (b) paid." Because, however, the IRS mailed the notice to the Renton home that Plaintiffs had sold at the 2011 short sale, Plaintiffs never received or responded to it. Given Plaintiffs' lack of response, the IRS disallowed the interest deduction and assessed additional tax due.

After Plaintiffs later learned of the IRS's action, they pursued various administrative remedies, but in May 2018, the IRS Appeals Office denied Plaintiffs' requests for relief. In doing so, the IRS explained that Plaintiffs had "realized income from cancellation of debt of $222,977.95" at the short sale, but that Plaintiffs "were not required to recognize that income because it was non-recourse debt." "[B]ecause [Plaintiffs] have unrecognized income from forgiveness of debt in excess of the accrued interest," the IRS stated, they "have no loss of income from that interest." The IRS therefore concluded that the interest deduction was properly disallowed under I.R.C. § 265(a)(1), which precludes deductions that are "allocable to one or more classes of income . . . wholly exempt from the taxes imposed by this subtitle." That limitation on deductions applied here, according to the IRS, because the asserted cancellation-of-debt income that occurred at the short sale was exempt from income taxes "due to being non-recourse."

Plaintiffs paid the tax assessed and filed a claim for a refund with the IRS. After the IRS did not respond within six months, Plaintiffs filed this civil action seeking a refund under 28 U.S.C. § 1346(a)(1) and 26 U.S.C. §§ 6532(a)(1), 7422(a). The district court, however, granted the IRS's motion to dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

In dismissing the action, the district court did not rely on the § 265-based rationale that the IRS had invoked in its earlier response to Plaintiffs. Instead, the court reasoned that, although "interest deductions are generally allowed," Plaintiffs' interest payments fell under an exception established in *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1048–49 (9th Cir. 1976), for interest claimed in connection with purportedly debt-financed transactions that

lacked economic substance.  Although Plaintiffs were unlike the taxpayers in *Estate of Franklin*—who had acquired their debt liability in a transaction that lacked economic substance—the district court extended *Estate of Franklin* to cover validly issued mortgages that later resulted in short sales in which "the nonrecourse liability (here, the mortgage) exceeds a reasonable estimate of the fair market value of the indebted property."  Because the fair market value of Plaintiffs' property had declined to well below the mortgage balance, the district court concluded that the "transaction" lacked economic substance and that therefore any interest deduction relating to that transaction was barred.

Plaintiffs timely appealed the district court's judgment. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we review the motion to dismiss de novo.  *Wells Fargo Bank, N.A. v. Mahogany Meadows Ave. Tr.*, 979 F.3d 1209, 1213 (9th Cir. 2020).

## II

We hold that, on the facts as pleaded, Plaintiffs are entitled to deduct the mortgage interest paid in connection with the short sale of their home in 2011.

## A

As noted earlier, the district court rested its dismissal on the view that, under *Estate of Franklin*, Plaintiffs' underwater nonrecourse mortgage did not constitute a genuine indebtedness that could support a mortgage interest deduction.  We conclude that the district court erred in extending the principles of *Estate of Franklin* to short sales involving mortgages that were valid *ab initio*.

In *Estate of Franklin*, we concluded that a partnership's purported debt-financed "purchase" of a motel and related property lacked economic substance and therefore did not give rise either to genuine indebtedness that would be "able to support an interest deduction" or to an "investment in the property" that would support deductions for depreciation. 544 F.2d at 1049 (emphasis omitted). In reaching this conclusion, we relied on a number of features of the relevant transaction. In particular, we noted that the property was purchased at an apparently inflated price that exceeded "a demonstrably reasonable estimate of the fair market value." *Id*. at 1048. Moreover, although $75,000 in "prepaid interest" was paid up front by the partnership, thereafter the partnership effectively did not have to make any further payments for 10 years: although principal and interest payments were due each month, those payments were set at an amount that closely approximated the monthly lease payments due from the "seller," who retained possession of the motel pursuant to a lease-back arrangement. *Id*. at 1046–47. In addition, because the loan securing the purported sale of the property was nonrecourse, the partnership had the ability, when a "balloon" payment came due in 10 years, to "walk away from the transaction and merely lose its $75,000 'prepaid interest payment.'" *Id*. at 1047. And because, from the outset, the purchase price exceeded the fair market value of the property, the modest payments of principal yielded no equity. *Id*. at 1048. On top of all this, no deed was ever recorded, and the "'benefits and burdens of ownership' appeared to remain" with the sellers. *Id*. at 1047.

On these facts, we held in *Estate of Franklin* that the purchase lacked "the substance necessary to justify treating the transaction as a sale *ab initio*." 544 F.2d at 1048. The structure of the transaction confirmed that, "in accordance with the *design* of the parties," any "payments of the

purchase price" would not yield any "equity to the purchaser." *Id*. at 1049 (emphasis added). And given that, from the outset, the nonrecourse "debt" secured by the property exceeded the property's fair market value and no meaningful payments were required for 10 years, there was no genuine indebtedness, but rather only a "mere chance that a genuine debt obligation may arise." *Id*. Lacking economic substance, the transaction could not support either depreciation deductions or interest deductions. *Id*.

We expressly stated, however, that our holding was "limited to transactions substantially similar to that now before us." *Id*. In particular, we reaffirmed the ordinary rule that "the absence of personal liability for the purchase money debt secured by a mortgage on the acquired property does not deprive the debt of its character as a bona fide debt obligation able to support an interest deduction." *Id*. We likewise explicitly distinguished cases in which "the purchase price was at least approximately equivalent to the fair market value of the property." *Id*. at 1048. The transaction before us, we emphasized, lacked the economic substance necessary to characterize it "as a sale *ab initio*." *Id*.

Given the careful limitations that we placed on our reasoning and holding in *Estate of Franklin*, the district court erred in extending them to the very different circumstances presented here. In *Estate of Franklin*, we placed dispositive weight on the fact that, from the outset, the distinctive arrangements of the transaction were coupled with a "purchase price" that "exceed[ed] a demonstrably reasonable estimate of the fair market value." *Id*. at 1048; *see also id*. at 1046 n.1 (observing that, "the fundamental issue" in such cases "generally will be whether the property has been 'acquired' at an artificially high price, having little

relation to its fair market value"). Here, of course, there is no suggestion that Plaintiffs *acquired* their original mortgage (or their refinanced mortgage) in a transaction that lacked economic substance. On the contrary, on the facts as pleaded here, the mortgage-financed purchase of Plaintiffs' home was a valid "sale *ab initio*," and neither that transaction nor their subsequent refinancing lacked economic substance. *Id*. at 1048; *cf. also Beck v. Commissioner*, 678 F.2d 818, 820 (9th Cir. 1982) (applying *Estate of Franklin* to transaction in which the $1,008,000 largely debt-financed purchase price exceeded the property's fair market value by nearly $800,000). Nothing in *Estate of Franklin* suggests that, without more, a *subsequent* collapse in real estate values means that the now-underwater mortgage should be considered a sham debt that cannot support a mortgage interest deduction. Similarly, the fact that Plaintiffs' mortgage became nonrecourse (as a consequence of their bankruptcy) "does not deprive the debt of its character as a bona fide debt obligation able to support an interest deduction." *Estate of Franklin*, 544 F.2d at 1049.[2] And, unlike in *Estate of Franklin*, Plaintiffs remained the legal owners, with actual possession of the property, until it was sold at the 2011 short sale. *Id*. at 1047.[3]

---

[2] As noted below, we do not have before us a situation in which the loan was altered in a subsequent transaction that entailed a "significant modification" of the loan for tax purposes. *See infra* at 22–25. We express no view as to whether a different result would be warranted in such a case.

[3] The abandonment of Plaintiffs' residence by the bankruptcy trustee, and the subsequent discharge of Plaintiffs' personal liability on the mortgage, did not convey legal title of that property to CitiMortgage. *See Mason*, 646 F.2d at 1310.

Accordingly, we conclude that the district court erred in applying *Estate of Franklin* to the very different circumstances presented here.

## B

We reject the IRS's alternative argument that I.R.C. § 265(a)(1) precludes Plaintiffs' home mortgage interest deduction.  Our analysis of this issue proceeds in two steps. First, where (as here) a short sale involves *nonrecourse* debt, the transaction does not give rise to cancellation-of-debt income that might trigger the application of § 265.  Second, Plaintiffs' bankruptcy discharge, which converted the mortgage from recourse to nonrecourse a year before the short sale, has no effect on the otherwise applicable tax treatment of the later short sale.

## 1

Under the analysis set forth in the Tax Court's decision in *Catalano v. Commissioner*, T.C. Memo. 2000-82, *rev'd on other grounds*, 279 F.3d 682 (9th Cir. 2002), the result in this case would be straightforward if Plaintiffs' debt had been nonrecourse from its inception.[4]  *Catalano* started from the premise that a short sale or foreclosure involving *nonrecourse* debt is treated as a single transaction in which any loan forgiveness is folded into the debtor's "gain or loss" in the sale of the property.  *Id*. at *3.  *Catalano* then concluded that, when the amount realized by the debtor in such a sale or foreclosure includes "both principal and accrued interest," the debtor "is appropriately deemed to

---

[4] Although Tax Court memorandum decisions are not precedential, *see InverWorld, Ltd. v. Commissioner*, 979 F.2d 868, 878 n.9 (D.C. Cir. 1992), we find the analysis in *Catalano* to be instructive.

have paid the interest in the disposition of his residence" and "*is entitled to the interest deduction*" associated with that payment. *Id*. at \*4 (emphasis added). Both aspects of *Catalano*'s analysis are consistent with settled law, and we follow a similar analysis here.

**a**

The law is clear that a short sale or foreclosure involving nonrecourse debt may give rise to income "derived from dealings in property" under I.R.C. § 61(a)(3), but it does not give rise to income "from discharge of indebtedness" under I.R.C. § 61(a)(11).

As a general matter, a "repossession of property securing a debt constitutes a taxable sale or exchange." *Estate of Delman v. Commissioner*, 73 T.C. 15, 28 (1979). Moreover, the Supreme Court has held that, under *Crane v. Commissioner*, 331 U.S. 1 (1947), "[w]hen a taxpayer sells or disposes of property encumbered by a *nonrecourse* obligation*," he or she must "include among the assets realized *the outstanding amount of the obligation*." *Commissioner v. Tufts*, 461 U.S. 300, 317 (1983) (emphasis added). This same rule applies even "when the unpaid amount of the nonrecourse mortgage exceeds the value of the property transferred." *Id*. at 307. If the result of the short sale, and its accompanying extinguishment of nonrecourse debt, is that the taxpayer realizes a "gain" on the sale, then the taxpayer may realize taxable income "derived from dealings in property" under I.R.C. § 61(a)(3). *See 2925 Briarpark Ltd. v. Commissioner*, 163 F.3d 313, 318 (5th Cir. 1999) ("Section 61(a)(3) applies when a taxpayer agrees to surrender the property in exchange for the cancellation of a [nonrecourse] debt," with "the whole amount of the canceled nonrecourse indebtedness being includable in the amount realized under [I.R.C.] § 1001.");

*see also* I.R.C. § 1001 (providing rules for calculation of gain or loss on a "sale or other disposition of property"). Any such "income realization is *not* based on cancellation of indebtedness." *Estate of Delman*, 73 T.C. at 33 (emphasis added).

The facts of *Tufts* illustrate how these principles work. In *Tufts*, a partnership took out a $1,851,500 nonrecourse mortgage to finance the construction of an apartment complex. *Id*. at 302. After the complex was completed, the property's fair market value fell to $1,400,000, and the partners sold their interests in the property to a third party for almost no consideration other than that party's assumption of the nonrecourse loan. *Id*. at 303. At the time of the sale, the partnership's adjusted basis in the property was $1,455,740. *Id*. at 302. Because the property's fair market value of $1,400,000 on the day of the sale was less than this adjusted basis, the partners claimed a partnership loss of $55,740. *Id*. at 303. The Commissioner disagreed, arguing that the partnership had realized a *gain* of approximately $400,000 because, in the sale of the property, the partnership "had realized the full amount of the nonrecourse obligation," which was over $1,800,000. *Id*. The Supreme Court agreed, holding that the Commissioner properly included, "in the amount realized" on the sale, "the amount of the nonrecourse mortgage assumed by the purchaser." *Id*. at 309. Although the facts of *Tufts* involved the assumption of a nonrecourse mortgage rather than its cancellation, there is no reason why its analysis would not apply in the latter context. Under *Tufts*, therefore, a cancellation of a nonrecourse loan in a short sale or foreclosure gives rise to income derived from dealings in property, rather than income from discharge of indebtedness.

The analysis is different, however, when there is a short sale or foreclosure involving *recourse* debt. "With a recourse debt, a debtor remains liable for the unpaid balance after a foreclosure sale." *2925 Briarpark, Ltd.*, 163 F.3d at 318 n.2. Therefore, unlike the situation with a nonrecourse debt (in which the foreclosure on the deed of trust itself eliminates the only means to collect on the debt), some *additional* action, beyond the transfer of the property, is required to eliminate the otherwise surviving personal liability associated with recourse debt. Consequently, a foreclosure involving the forgiveness of *recourse* debt, for tax purposes, is split into two transactions: (1) the transfer of the property itself—a transaction in which "the unpaid portion [of the loan] is *not* used to calculate 'amount realized'" on the sale or exchange, *id*. (emphasis added) (citation omitted); and (2) a forgiveness of the surviving *individual* liability, which gives rise to "discharge of indebtedness" income under I.R.C. § 61(a)(11). *See* Treas. Reg. § 1.1001-2(c), Ex. 8; *see also id.* § 1.1001-2(a)(2) ("The amount realized on a sale or other disposition of property that secures a recourse liability does not include amounts that are . . . income from the discharge of indebtedness.").[5]

The Tax Court's decision in *Simonsen v. Commissioner*, 150 T.C. 201 (2018), further confirms the settled rules governing short sales involving nonrecourse encumbrances. In *Simonsen*, the taxpayers successfully negotiated a short

---

[5] In her concurrence in *Tufts*, Justice O'Connor argued that, if the Court were writing on a clean slate, it might make sense to separate into two transactions a sale of property encumbered by a nonrecourse mortgage that exceeds the property's value. 461 U.S. at 317–19. But given that the IRS regulations and lower-court caselaw had long taken a different approach, she agreed with the Court's decision not to adopt such a change judicially. *Id*. at 319.

sale when, after the 2008 financial crisis, their existing nonrecourse mortgage debt greatly exceeded their home's fair market value. *Id*. at 201–02. Unlike in the present case, the taxpayers in *Simonson* would have benefitted from splitting the short sale into two transactions, and they therefore argued that "the sale and consequent debt forgiveness" should be treated as "two separate transactions that resulted in both [1] a substantial deductible loss [on the sale] and [2] excludable cancellation-of-indebtedness (COI) income." *Id*. at 202. The IRS disagreed, arguing that the law was clear that the short sale is treated as "one transaction and the discharged debt is included in the amount realized on the sale." *Id*. The Tax Court agreed with the IRS, concluding that "[t]here was but one transaction" and that its tax treatment was dictated by *Tufts*. *Id*. at 211–12. The Tax Court held that the IRS thus correctly included "the debt discharged . . . in the amount realized" on the sale, and the resulting income was properly classified as "'[g]ains derived from dealings in property' under section 61(a)(3)." *Id*. at 206–07; *see also id*. at 213 ("This means that we have to apply the rules for computing gain or loss on a sale and not the rules for calculating the amount of COI income.").[6]

Accordingly, because Plaintiffs' short sale here involved the extinguishing of nonrecourse debt, it did not generate cancellation-of-indebtedness income within the meaning of I.R.C. § 61(a)(11). The transaction instead must be evaluated under *Tufts* as a single transaction that may produce "[g]ains derived from dealings in property." I.R.C.

---

[6] *Simonsen* thus refutes the dissent's suggestion that *Tufts* "applies only when the taxpayer retains an ownership interest in the property" after the transaction and therefore does not apply to a short sale in which "any remaining interest [the mortgagors] had held in the property dissolved with the sale of the property." *See* Dissent at 32, 33.

§ 61(a)(3).  Plaintiffs contend that, applying that approach here, the short sale in this case produced a nondeductible *loss*, rather than a gain.  The IRS's brief in this court has not disputed that particular point, and we therefore take the point as conceded for purposes of this appeal.[7]  Accordingly, under the settled rules that are applicable to a short sale involving nonrecourse debt, Plaintiffs' sale did not generate any taxable income.

**b**

The next question is whether—again applying the normal rules that govern short sales concerning nonrecourse debt—Plaintiffs were entitled to deduct the mortgage interest that CitiMortgage received at the short sale.  We conclude that the answer is yes—Plaintiffs paid the interest in question, and the interest payment is deductible.

The case before us is in this respect analogous to *Catalano*.  There, the Tax Court first concluded that the San Francisco residence at issue had been abandoned to the debtor during his bankruptcy proceedings.  T.C. Memo. 2000-82, at *3.  The property was encumbered by a mortgage held by Wells Fargo, which "was either nonrecourse or treated as nonrecourse under California law." *Id*.  When the home was subsequently sold at a foreclosure, there was an outstanding principal balance of $1,341,352 on that mortgage, and the residence was sold at the foreclosure sale for $1,215,000.  *Id*. at *2.  The debtor sought to take a deduction for mortgage interest paid to Wells Fargo in

---

[7] Instead, the IRS suggests that the earlier shift of Plaintiffs' loan from recourse to nonrecourse during the bankruptcy proceedings has the effect of rendering the standard *Tufts* analysis inapplicable.  This argument is wrong for reasons explained below.  *See infra* at 21–27.

connection with the short sale, but the IRS disallowed the deduction on the ground that the fair market value of the residence was less than the outstanding mortgage principal. *Id*. at *3.  The Tax Court concluded that, under *Tufts*, it was irrelevant what the fair market value of the house was at the time of the foreclosure sale.  *Id*.  Instead, under *Tufts*, the amount that the debtor "realized upon the disposition of his residence in foreclosure included both the principal indebtedness and the interest that had accrued as of the foreclosure date."  *Id*.; *see also Allan v. Commissioner*, 856 F.2d 1169, 1171–72 (8th Cir. 1988).  Consequently, the Tax Court concluded, the debtor "is appropriately deemed to have paid the interest in the disposition of his residence," and he was therefore "entitled to the interest deduction here."  *Id*. at *4.[8]

The same result follows here.  When, as in this case, nonrecourse liability "is extinguished in exchange for an asset, 'the transaction is treated as if the transferor had sold the asset for cash equivalent to the amount of the debt and had applied the cash to the payment of the debt.'"  *Catalano*, T.C. Memo. 2000-82 at *4 (quoting *Unique Art Mfg. Co. v. Commissioner*, 8 T.C. 1341, 1342 (1947)).  Here, CitiMortgage received approximately $522,000 from the short sale.  CitiMortgage applied $114,688 of that payment to interest, consistent with Treas. Reg. § 1.446-2(e)(1) (and, presumably, in accordance with the terms of its deed of

---

[8] On appeal in *Catalano*, we reversed the Tax Court's threshold determination that there had been an abandonment of the property by the bankruptcy trustee, and we therefore had no occasion to address whether the Tax Court's analysis based on that determination was otherwise correct.  *See* 279 F.3d at 687–88.  Here, by contrast, it is undisputed that the bankruptcy trustee abandoned Plaintiffs' residence, and *Catalano*'s analysis of the tax consequences of such an abandonment, and a subsequent short sale, is therefore instructive here.

trust), and it reported that amount as interest received on a Form 1098-MIS. Applying payments to interest first is the long-established default rule in federal and Washington law. *See Story v. Livingston*, 38 U.S. 359, 371 (1839) ("The correct rule, in general, is, that the creditor shall calculate interest, whenever a payment is made. To this interest, the payment is first to be applied; and if it exceed the interest due, the balance is to be applied to diminish the principal. If the payment fall short of the interest, the balance of interest is not to be added to the principal so as to produce interest."); *Clausing v. Virginia Lee Homes, Inc.*, 384 P.2d 644, 647 (Wash. 1963) ("Installment payments are applied first to payment of interest and the remainder, if any, applied to payment of principal."). Plaintiffs therefore must be deemed to be the persons who paid that mortgage interest to CitiMortgage. *See also* Treas. Reg. § 1.446-2(e)(1) (stating the general rule that, when a taxpayer makes a payment on a loan that consists of both accrued interest and principal, "each payment under [the] loan . . . is treated as a payment of interest to the extent of the accrued and unpaid interest . . . ."). Moreover, because, under *Tufts*, Plaintiffs are deemed at the short sale to have realized an amount that includes all of the discharged nonrecourse debt, including the accrued interest, *see Allan*, 856 F.2d at 1172–73; *Catalano*, T.C. Memo. 200-82 at *4, they must for that further reason be deemed to have made the payment of interest that CitiMortgage received. And because Plaintiffs paid that mortgage interest, it was deductible under I.R.C. § 163(a), (h)(2)(D), (h)(3).**[9]**

---

**[9]** The dissent's contrary view is based on the premise that, because Plaintiffs "had long ago pledged any sale proceeds to CitiMortgage by deed of trust," their home was "an asset belonging wholly to another (in this case CitiMortgage)," and therefore the interest payment received by

In contending that Plaintiffs did not make the interest payment here, the IRS argues that *Crane*'s rule that debtors realize a benefit from, and therefore have a corresponding interest in, the full amount of nonrecourse debt discharged at a sale should not apply here because, "'if the value of the property is less than the amount of the mortgage, a mortgagor who is not personally liable cannot realize a benefit equal to the mortgage'" (quoting *Crane*, 331 U.S. at 14 n.37).    This argument is plainly wrong, because it attempts to distinguish *Crane* on grounds that were expressly rejected in *Tufts*.    As the Court in *Tufts* explained after quoting that very footnote from *Crane*: "This case presents that unresolved issue.  We are disinclined to overrule *Crane*, and we conclude that the *same* rule applies when the unpaid amount of the nonrecourse mortgage exceeds the value of

---

CitiMortgage at the short sale was one that CitiMortgage "alone generated."  *See* Dissent at 31, 34.  No authority supports the dissent's novel view that owners of homes with underwater mortgages do not really own their homes at all.  On the contrary, unless and until the house is sold or foreclosed on, homeowners have a continued ownership interest in their residence and could, for example, benefit from any unexpected rally in the price of the home.  *Cf. Allan*, 856 F.2d at 1173 ("[T]here is no doubt that had the Apartment recovered financially, the Partnership would have been legally obligated to repay the entire outstanding principal amount of the mortgage, including . . . the interest thereon."); *cf. also Alsberg v. Robertson* (*In re Alsberg*), 68 F.3d 312, 313–14 (9th Cir. 1995) (noting that the value of debtors' home rose from $259,000 to $380,000 one year after they filed for bankruptcy, thereby producing enough funds to pay off the mortgage in full and produce a $115,000 profit).  Moreover, the dissent's premise that CitiMortgage paid the interest to itself ignores *Crane*'s teaching that, for tax purposes, a mortgagor may not need to have actually received the proceeds of a sale to be deemed to have paid them over.  *See* 331 U.S. at 13 (noting that, in some circumstances, a seller who has not actually received funds will be treated as having had the money "'paid [to] it and then paid over by it to its creditors'") (citation omitted)).

the property transferred." 461 U.S. at 307 (emphasis added).[10]

Accordingly, we conclude that, if the ordinary rules applicable to a short sale involving the extinguishment of nonrecourse debt are applied here, then Plaintiffs were entitled to the mortgage interest deduction that they took.[11]

## 2

The only remaining question, then, is whether a different outcome is warranted here based on the fact that, as a result of their 2010 bankruptcy discharge, Plaintiffs' mortgage was effectively converted from recourse to nonrecourse. The IRS argues that the 2010 bankruptcy discharge's conversion of Plaintiffs' mortgage to nonrecourse rendered any interest payment at the 2011 short sale disallowable under I.R.C.

---

[10] Notably, the IRS does not contend that the deductible interest payment is allocable to a tax-exempt *gain* on the sale of Plaintiffs' residence, *see* I.R.C. § 121, thereby triggering I.R.C. § 265(a)(1), which disallows otherwise-allowable deductions that are "allocable to one or more classes of income . . . wholly exempt from the taxes imposed by this subtitle." (The IRS does argue that § 265(a)(1) applies here, but only based on Plaintiffs' bankruptcy. We address the IRS's bankruptcy-based theory below. *See infra* at 21–27.) As noted earlier, the IRS did not contest Plaintiffs' assertion that there was a loss on the sale, rather than a gain. *See supra* at 17.

[11] The dissent argues that, if Plaintiffs are deemed to have paid the mortgage interest that CitiMortgage received, that would create a "moral hazard" that presents "a threat to the integrity of the Tax Code." *See* Dissent at 34. These concerns are overwrought. Our analysis avoids a converse problem in which the Government simultaneously denies that Plaintiffs made any interest payment to CitiMortgage at the short sale while treating a portion of the funds received by CitiMortgage as interest payments that are then presumptively taxable income as to CitiMortgage. The Government, too, "cannot have it both ways." *See id*.

§ 265(a)(1), which provides that "[n]o deduction shall be allowed for . . . [a]ny amount otherwise allowable as a deduction which is allocable to one or more classes of income . . . wholly exempt from the taxes imposed by this subtitle."   I.R.C.  § 265(a)(1).   According to the IRS, Plaintiffs' mortgage interest deduction was precluded under this section because (1) Plaintiffs received "income" when their bankruptcy discharge converted their mortgage from recourse to nonrecourse; and (2) that income was exempt from taxation under I.R.C. § 108(a)(1)(A), which exempts from taxable income any discharge of indebtedness that "occurs in a title 11 case."   Neither premise of the IRS's argument is correct, as the plain language of the statute and regulations makes clear.

**a**

The IRS is wrong in positing that the conversion of Plaintiffs' mortgage from recourse to nonrecourse gave rise to otherwise taxable "income" that was then exempted from taxation by operation of § 108(a)(1)(A).  As the text of the statute makes clear, § 108(a)(1)(A) is *only* triggered when there is an "amount which (*but for this subsection*) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer."  I.R.C. § 108(a)(1) (emphasis added).  Here, however, there is no basis for concluding that the 2010 conversion of Plaintiffs' mortgage from recourse to nonrecourse gave rise to "income" that "but for this subsection"—*i.e.*, but for § 108(a)—would have been included in Plaintiffs' taxable income.    On   the   contrary,   the   applicable   Treasury regulations squarely refute this contention.

A change in a debt instrument will be deemed to give rise to a potentially taxable exchange of debt instruments only if, *inter alia*, the underlying debt instrument undergoes a

"*significant* modification."    Treas. Reg. § 1.1001-3(b) (emphasis added).[12]  A "change (in whole or in part) in the recourse nature of the instrument (from recourse to nonrecourse or from nonrecourse to recourse) is a modification." *Id*. § 1.1001-3(c)(2)(i); *see also id*. § 1.1001-3(c)(1)(i) ("A modification means any alteration, including any deletion or addition, in whole or in part, of a legal right or obligation of the issuer or a holder of a debt instrument, whether the alteration is evidenced by an express agreement (oral or written), conduct of the parties, or otherwise.").  A modification, however, is generally deemed to be "a significant modification only if, based on all facts and circumstances, the legal rights or obligations that are altered and the degree to which they are altered are economically significant."    *Id*. § 1.1001-3(e)(1).    Amplifying on that standard, the regulations specifically address when a conversion of a loan from recourse to nonrecourse will be deemed to entail a "significant modification." *Id*. § 1.1001-3(e)(5)(ii).  Under those rules, a "modification that changes a recourse debt instrument to a nonrecourse debt instrument is not a significant modification if [1] the instrument continues to be secured only by the original collateral and [2] the modification does not result in a change in payment expectations." *Id*. § 1.1001-3(e)(5)(ii)(B)(2).

Under the facts as pleaded, the change in Plaintiffs' mortgage from recourse to nonrecourse does not meet the definition of a significant modification.    First, the loan continued to be "secured only by the original collateral." Treas. Reg. § 1.1001-3(e)(5)(ii)(B)(2).  Second, there was no

---

[12] All citations of the Treasury regulations in this paragraph are of the April 1, 2010 version that was in effect when Plaintiffs obtained their bankruptcy discharge.    The current regulations contain changes in wording that are immaterial to the issues addressed here.

change in payment expectations. A "change in payment expectations occurs if, as a result of [the] transaction," either (1) there is "a substantial enhancement of the obligor's capacity to meet the payment obligations under a debt instrument and that capacity was primarily speculative prior to the modification and is adequate after the modification"; or (2) there is "a substantial impairment of the obligor's capacity to meet the payment obligations under a debt instrument and that capacity was adequate prior to the modification and is primarily speculative after the modification." *Id*. § 1.1001-3(e)(4)(vi). Taking the well-pleaded allegations in the complaint as true, there is no basis for concluding that Plaintiffs' capacity to meet their payment obligations under their CitiMortgage loan was any different before and after the bankruptcy discharge. Under the allegations of the complaint, Plaintiffs became unable to meet their payment obligations in early 2009 and remained unable to do so thereafter, including after their bankruptcy discharge. Because the modification of Plaintiffs' loan from recourse to nonrecourse in 2010 did not involve a "significant modification," it did not give rise to a potentially taxable event.

Accordingly, the conversion of Plaintiffs' mortgage from recourse to nonrecourse as a result of the bankruptcy discharge did not give rise to any *income* that "(but for this subsection [108(a)]) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness." I.R.C. § 108(a)(1). Thus, the IRS is incorrect in concluding that Plaintiffs had *otherwise-taxable* income from that conversion that was then exempted from taxation by § 108(a)(1). Rather, they had no "income" from that conversion in the first place, regardless of § 108(a)(1). For that reason alone, § 265(a)(1) can have no application here. *See* I.R.C. § 265(a)(1) (stating that its deduction

disallowance rule only applies if there is associated "income" that is then "wholly exempt" from taxation).[13]

**b**

There is an alternative and independent reason why § 265(a)(1) does not preclude Plaintiffs' home mortgage interest deduction. Even assuming (contrary to the reality) that the conversion of Plaintiffs' mortgage to nonrecourse was a taxable event that gave rise to otherwise taxable cancellation-of-indebtedness income, the exemption that would then apply under § 108(a)(1)(A) does not meet § 265(a)(1)'s requirement that the exemption be one that "wholly exempt[s]" that "class[] of income" from taxation. I.R.C. § 265(a)(1).

As noted earlier, § 108(a)(1) provides that "[g]ross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if . . . (A) the discharge occurs in a title 11 case." However, § 108(b)(1) provides that "[t]he amount excluded from gross income under subparagraph (A) . . . of subsection (a)(1) shall be applied to reduce the tax attributes of the taxpayer . . . ." Thus, for example, a taxpayer who benefits from a § 108(a)(1)(A) exclusion of debt-cancellation income

---

[13] The dissent implies that the "monetary gain" attributable to the conversion of the loan from recourse to nonrecourse brings this case within the scope of § 108 and § 265. However, these provisions require that the assertedly tax-exempt amount otherwise count as "income," and the dissent has failed to explain how the "monetary gain" in this case qualifies as "income." *See* Dissent at 33. This would rewrite the plain language of § 108 and § 265, which we may not do. Similarly, the dissent fails to explain how the *reasoning* of *Tufts* can be distinguished on the grounds that that case "did not involve a bankruptcy." *Id*. at 33.

may need to reduce the basis of his or her property by the amount of the exclusion. *See* I.R.C. § 108(b)(2)(E). That, of course, would increase the gain on a subsequent sale of the property by a corresponding amount. The Supreme Court has thus aptly noted that "the effect of § 108 is not genuinely to exempt such income from taxation, but rather to defer the payment of the tax" by, *inter alia*, "increasing the size of taxable gains upon ultimate disposition of the reduced-basis property." *United States v. Centennial Sav. Bank FSB*, 499 U.S. 573, 580 (1991); *see also*, *e.g.*, *Simonsen*, 150 T.C. at 204 n.7 ("When [cancellation of indebtedness] income is excluded, there is typically a corresponding adjustment made somewhere so that the Commissioner doesn't forgo tax forever."); *Nelson v. Commissioner*, 110 T.C. 114, 125 (1998) (en banc) ("An exclusion that is subject to an offset (the tax attribute reductions) and may be subject to taxation in the future (that is, excluded from *gross income for the taxable year*) does not signify or indicate an item of income that is necessarily tax exempt on a permanent basis."), *aff'd* 182 F.3d 1152 (10th Cir. 1999).

It follows that cancellation-of-indebtedness income exempted under § 108(a)(1)(A) is not "wholly exempt" from income taxation within the meaning of § 265(a)(1). *See Cotton States Fertilizer Co. v. Commissioner*, 28 T.C. 1169, 1173 (1957) (holding that the predecessor to § 265 did not apply to an exclusion that "requires the taxpayer to decrease the basis of the new property by the amount of the gain not recognized by reason of its election" under a provision of the Code addressing involuntary conversions, because the exclusion did "not result in giving a 'wholly exempt' classification to income received . . . . At best, [it] provides for the postponement of tax."); *Hawaiian Tr. Co. v. United States*, 291 F.2d 761, 773 (9th Cir. 1961) ("Wholly exempt

income is never taxed. . . . [Nonrecognized gains] may be taxed, however, . . . at another time. In other words, [they] are not 'wholly exempt' from the tax.").

The IRS argues that Plaintiffs have not offset their tax attributes under § 108(b), but the plain language of § 265(a)(1) requires that the relevant exemption be one that "*wholly* exempt[s]" a "class[ ] of income" from income taxation, not merely one that "exempts" income from taxation. I.R.C. § 265(a)(1) (emphasis added). For the reasons set forth above, § 108(a)(1)(A) does not meet that standard here and it therefore provides no basis for applying § 265(a)(1).

### III

In sum, Plaintiffs' home mortgage interest deduction is not precluded by *Estate of Franklin*. Moreover, under the settled rules for a short sale involving the extinguishment of nonrecourse debt, the *Tufts* approach applies, and Plaintiffs were entitled to take the corresponding mortgage interest deduction for the interest paid and received at the short sale. The fact that, during an earlier bankruptcy, Plaintiffs' mortgage had been converted, through their bankruptcy discharge, from recourse to nonrecourse, provides no basis for declining to apply those rules.

**REVERSED.**

STEARNS, District Judge, dissenting:

Because I am persuaded that the majority opinion is based on a fictional factual premise and a misreading of the applicable law, I respectfully dissent. The flawed factual premise is this: It is simply not the case, as the majority asserts, that appellants Lisa Milkovich and Dang Nguyen "paid" the mortgage interest for which they sought a tax deduction, and no amount of "deeming" it so can make it otherwise. *See* Majority op. at 19. I also believe that the majority's rejection of the sound reasoning of the Internal Revenue Service (IRS), relying on a twenty-year-old nonprecedential (and never since cited as authority) Tax Court memorandum decision, *Catalano v. Comm'r*, T.C. Memo. 200-82, *rev'd*, 279 F.3d 682 (9th Cir. 2002), is in error and contrary to precedent in this Circuit.

Let me begin with where I agree with the majority. The essential facts are not in dispute. In 2005, Milkovich and Nguyen purchased a home in the State of Washington for $748,425. The purchase price reflected the fair market value of the home at the time. The couple refinanced the mortgage with Westwood Mortgage (later CitiMortgage) in 2006 for $744,993. Milkovich and Nguyen agreed to interest-only, monthly payments of $3,724.94. They stopped making the mortgage payments in February of 2009 and filed for bankruptcy on January 25, 2010.

The bankruptcy trustee abandoned the home on March 4, 2010, after determining it irretrievably under water. As a result of the discharge of the quasi-judicial lien, title to the property revested in Milkovich and Nguyen. *See* Jack F.

Williams, *The Tax Consequences of Abandonment under the Bankruptcy Code*, 67 Temp. L. Rev. 13, 30, 36 (1994).[1]

In April of 2010, Milkovich and Nguyen received a bankruptcy discharge. On July 21, 2011, the house was sold by CitiMortgage in a short sale for $550,000, from which CitiMortgage received $522,015. Of that amount, $114,688 was allocated to the payment of the outstanding interest on the $744,993 loan. *See* 26 C.F.R. § 1.446-2(e)(1). Subsequently, CitiMortgage sent Milkovich and Nguyen a Form 1098-MIS for the tax year 2011, which reported the receipt of $114,688 in mortgage interest from the couple.[2] As cash-basis taxpayers, Milkovich and Nguyen claimed an interest deduction of $114,688 on their 2011 tax bill based on 26 U.S.C. § 163.

On October 20, 2014, the IRS sent a notice of deficiency to Milkovich and Nguyen at the address of their former home proposing to disallow the couple's $114,688 interest

---

[1] The trustee's abandonment of the property had no tax consequences independent of the conversion of Milkovich and Nguyen's debt from recourse to nonrecourse. "Under tax law, abandonment is the equivalent of a sale or exchange . . . . [B]ankruptcy abandonment[, however,] is an entirely different species . . . best viewed as a disclaimer of interest in estate property by a trustee as the representative of the estate. The rights and responsibilities that existed in the property immediately before the bankruptcy filing remain with the debtor throughout the administration of the case, subject to the trustee's judicial lien power. . . . The effect of a trustee's release of its judicial lien is to divest control over the abandoned asset, . . . [thus] bankruptcy abandonment is not a transfer or exchange for tax purposes any more than the release of a judicial lien is a transfer or exchange." Williams, *supra*, 67 Temp. L. Rev. at 35–36; *see also In re Olson*, 930 F.2d 6, 8 (8th Cir. 1991) (*per curiam*).

[2] There is no explanation in the record as to why CitiMortgage mailed the Form-1098-MIS to the appellants.

deduction.  Because Milkovich and Nguyen no longer lived at the address, they did not receive the notice and did not respond.  The IRS disallowed the deduction in March of 2015 and assessed an additional tax due.  After a failed effort to persuade the tax examiner to reconsider the disallowance, Milkovich and Nguyen appealed.  In May of 2018, the IRS appeals office upheld the disallowance, citing to Internal Revenue Code (IRC) § 265 and Regs. 1.265-1, which "prohibit the deduction of expenses related to tax-exempt income."  Milkovich and Nguyen paid the outstanding tax liability and then filed this lawsuit in the district court.

The district court granted the government's Rule 12(b)(6) motion to dismiss in May of 2019.  Relying on *Estate of Franklin v. Comm'r*, 544 F.2d 1045 (9th Cir. 1976), the court held that because the underlying transaction lacked "economic substance," it fell "squarely" within *Franklin*'s sham transaction tax avoidance rule.  *Milkovich v. United States*, No. 2:18-CV-01658-BJR, 2019 WL 2161665, at *2 (W.D. Wash. May 17, 2019), quoting *Franklin,* 544 F.2d at 1049.

I fully agree with the thorough explanation set out in Part IIA of the majority opinion as to why the district court's reliance on *Franklin* was misplaced.  I also agree with so much of Part IIB that explicates the differences between recourse and nonrecourse debt.  I disagree, however, that *Catalano*'s holding—that a nonrecourse debtor whose property interest is liquidated at a short sale or foreclosure is entitled to deduct so much of the proceeds as is allocated to interest—is "consistent with settled law."  Majority Op. at 13.  It is not.

The IRC provides that a taxpayer may deduct "all interest paid or accrued within the taxable year on indebtedness."  26 U.S.C. § 163(a).  However, "[t]o justify

an interest deduction [under section 163(a)], a taxpayer *must actually pay* for the use or forbearance of money." *Beck v. Comm'r*, 678 F.2d 818, 821 (9th Cir. 1982) (emphasis added). In the 2011 tax year for which Milkovich and Nguyen sought to deduct mortgage interest (and during the preceding two years), they made no mortgage interest (or principal) payments. In other words, the interest payment that CitiMortgage received in tax year 2011 was one that it alone generated through the short sale (and one that it by law was required to report for tax purposes as corporate income). *Compare Golder v. Comm'r*, 604 F.2d 34, 36 (9th Cir. 1979) (noting that in a situation where a taxpayer seeks to deduct interest payments on "a non-recourse note secured by a mortgage on the land . . . [t]he taxpayer [still] *must pay* the interest to avoid foreclosure of his ownership interest in the property.") (emphasis added).

The IRC provides that "[n]o [tax] deduction shall be allowed for . . . [a]ny amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest . . . wholly exempt from the taxes imposed by this subtitle . . . ." 26 U.S.C. § 265(a)(1). Pursuant to I.R.C. § 108(a)(1)(A), income from a discharge of indebtedness in a bankruptcy case is exempt from gross income. The government does not argue that Appellants received a discharge of indebtedness income when the short sale closed. Rather, the government argues that prior to the short sale, "the discharge of taxpayers' personal liability on the mortgage loan was excluded from gross income because it occurred in a bankruptcy case," Appellee Br. at 31–32, and therefore "was exempt from taxation under I.R.C. § 108(a)(1)(A)." *Id.* at 35.

Milkovich and Nguyen counter that the transformation of their mortgage from recourse into nonrecourse debt

following the bankruptcy discharge did not result in a discharge of indebtedness at all.  This is because, they argue, the "'discharged debt' was ultimately [required to be] included in [the] amount realized on the sale of the personal residence," Appellants' Reply at 16, and so was not really "discharged" at all.  Appellants' contention relies on the Supreme Court's decision in *Comm'r v. Tufts*, 461 U.S. 300 (1983), and its holding that "[w]hen *a taxpayer sells or disposes of property encumbered by a nonrecourse obligation,* the Commissioner properly requires him to include among the assets realized the outstanding amount of the obligation. The fair market value of the property is irrelevant to this calculation." *Id.* at 317 (emphasis added). Appellants contend that both I.R.C. § 108 and I.R.C. § 265(a)(1) are inapplicable because the bankruptcy discharge merely deferred the tax consequences associated with the now-nonrecourse mortgage debt to a later stage—for example, when calculating assets realized upon disposition of the property.  As a result, they maintain that the discharged mortgage debt did not reflect income "wholly exempt from the taxes imposed by this subtitle."  I.R.C. § 265(a)(1).

What Milkovich and Nguyen's argument omits is the fact that *Tufts*'s refusal to differentiate between the tax implications of recourse and nonrecourse debt applies only when the taxpayer retains an ownership interest in the property and thus stands to benefit from any future gain in the property's sale or disposition, or conversely, from any capital loss.  "The principal application of Section 265(a)(1) is to bar the deduction of expenses incurred in the course of earning tax-exempt income." *Induni v. Comm'r*, 990 F.2d 53, 55 (2d Cir. 1993).  In interpreting Section 265, this Circuit has explained that "[w]holly exempt income is never taxed" as compared to income which "may be taxed . . . at

another time." *Hawaiian Tr. Co. Ltd. v. United States*, 291 F.2d 761, 773 (9th Cir. 1961).

Here, when Milkovich and Nguyen's mortgage was transformed from recourse debt into nonrecourse debt through bankruptcy, they received a monetary gain that was never taxed—that is, the discharge of personal liability on their mortgage debt.  Because of this discharge of personal liability, appellants were not later required to report as a taxable gain the $222,977.95 difference between the initial value of the mortgage and the amount CitiMortgage recouped from the short sale.  Thus, the discharge of the mortgage loan through bankruptcy resulted in a tax-exempt discharge of indebtedness within the meaning of I.R.C. § 108(a)(1)(A), precluding an interest deduction under I.R.C. § 265(a)(1).  The gain (in the form of debt relief) that Milkovich and Nguyen received through the bankruptcy discharge would not be erased by the application of *Tufts*, which would require them, as taxpayers holding nonrecourse debt, to include that debt in calculating the amount realized from the disposition of their former home, an imaginary prospect given the fact that any remaining interest they had held in the property dissolved with the sale of the property in July of 2011.  *Tufts*, 461 U.S. at 304.  While it is true that *Tufts* involved nonrecourse debt on a property in an amount greater than the property's fair market value, it did not involve a bankruptcy.[3]  *See* IRS Pub. 908 (Rev. Feb. 2020), Bankruptcy Tax Guide, 2020 WL 1268263, at *30 ("None

---

[3] Justice Blackmun took great care in *Tufts* to make clear that the holding in the case did not involve issues raised by insolvency and the cancellation of indebtedness. *See id*. at 310 n.11.  Justice Blackmun's note of caution is, I believe, a sufficient response to the majority's criticism that I fail to explain why the reasoning of *Tufts* does not apply in appellants' case.  Majority op. at 25 n.13.

of the *debt canceled* in a bankruptcy case is included in the debtor's gross income in the year it was canceled. Instead, certain losses, credits, *and basis of property* must be reduced by the amount *of excluded income* (but not below zero).") (emphasis added). Milkovich and Nguyen, in other words, cannot have it both ways—complete exoneration from liability while claiming a tax benefit from an asset belonging wholly to another (in this case, CitiMortgage). Nor, unlike the case in *Tufts*, were Milkovich and Nguyen the sellers of the debt as they had long ago pledged any sale proceeds to CitiMortgage by deed of trust.

Finally, while I attribute no wrongdoing to Milkovich and Nguyen in attempting to claim the interest deduction—they saw their chance and took it—I believe there is a moral hazard, as well as a threat to the integrity of the Tax Code, in ratifying a legal fiction as a legitimate tax deduction. For these reasons, I dissent.